UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

LAVONTE DOMINIQUE SIMMONS,    )
                              )
              Petitioner,     )
                              )
v.                            )        No.:   3:23-CV-136-TAV-DCP
                              )
VINCENT VANTELL,              )
                              )
              Respondent.     )

## MEMORANDUM OPINION

Petitioner Lavonte Dominique Simmons is a Tennessee inmate proceeding pro se on a federal habeas petition pursuant to 28 U.S.C. § 2254 in which he challenges the constitutionality of his confinement under 2015 Knox County judgments of conviction for one count of first-degree murder and two counts of aggravated assault [Doc. 1]. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court will not hold an evidentiary hearing[1], the petition will be **DENIED**, and this action will be **DISMISSED**.

---

[1] "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules"); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (providing an evidentiary hearing not required where record refutes the petitioner's allegations or otherwise precludes habeas relief).

## I.    SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

A Knox County grand jury indicted Petitioner on one count of first-degree premeditated murder and two counts of aggravated assault.  *State v. Simmon[2]*, No. E2016-01582-CCA-R3-CD, 2018 WL 1381786, at *1 (Tenn. Crim. App. Mar. 19, 2018), *perm. appeal denied* (Tenn. July 19, 2018) ("*Simmons I*").  As relevant here, the indictment for first-degree murder described the charge as: "On or about the 7th day of June, 2013, in the State and County aforesaid, [Petitioner] did unlawfully, intentionally and with premeditation kill Uniqua Brown, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee" [Doc. 14-1, p. 8].  The Tennessee Court of Criminal Appeals ("TCCA") summarized the trial evidence in its post-conviction appeal opinion as follows:

> The Petitioner's convictions arose out of his role as the shooter in a June 7, 2013 drive-by shooting at the Knoxville home of Charles Maples and Uniqua Brown, which the Petitioner carried out in retaliation for his younger brother's having been robbed the previous night. *Id.* at *1-4. At the time of the shooting, siblings Jasmine and Akeem Hollingsworth were standing in the driveway of the Brown-Maples residence on Nolan Avenue talking to Ms. Brown, who was in the passenger seat of Mr. Maples' Chevrolet Caprice. *Id.* at *1. As the Petitioner's Co-Defendant, Shawn O'Neill, drove the Petitioner's green Toyota Camry past the home, the Petitioner, who was in the front passenger seat, made eye contact with Mr. Hollingsworth, whom the Petitioner believed to have played a role in the robbery. *Id.* "The Camry then stopped at 'the neighbor's driveway,' and the [Petitioner] 'pulled out' an AK-47 and 'opened fire' on the group." *Id.*
>
> The Hollingsworth siblings both dropped to the ground when the shooting started. *Id.* Ms. Hollingsworth was uninjured and Mr. Hollingsworth suffered only a minor injury, but Ms. Brown died as a result of a severe gunshot

---

[2] The Tennessee Court of Criminal Appeals acknowledged that Petitioner stated at trial that his last name is "Simmons" but referred to Petitioner as "Simmon" in the direct appeal opinion because his name appeared that way in the indictment.  *Simmons I*, 2018 WL 1381786, at *33 n.1.

wound to her side. *Id.* Following a "be-on-the-lookout" or "BOLO" issued for the Petitioner's Camry, police officers located and arrested the Petitioner and his co-defendant, who were hiding in the basement of the Moses Avenue home of Ms. Teresa Williams and her three children: Braxton, Bronson, and Blair Williams. *Id.* at *2. The Petitioner and Co-Defendant O'Neill were subsequently indicted together for the first degree premeditated murder of Ms. Brown and the aggravated assaults of Mr. and Ms. Hollingsworth. *Id.* at *1. Their cases were later severed, and Co-Defendant O'Neill testified against the Petitioner at the Petitioner's trial. *Id.* at *3.-5.

According to Co-Defendant O'Neill's testimony, the Petitioner, the Petitioner's younger brother, Daquawn Simmons, and Co-Defendant O'Neill had all lived together in the same household in Memphis as children. *Id.* at *3. At the time of the shooting, Co-Defendant O'Neill and Daquawn still lived in Memphis, but the Petitioner lived in Knoxville. *Id.* During the late evening/early morning hours of June 5-6, 2013, Co-Defendant O'Neill drove Daquawn to the Williams' family residence on Moses Avenue. *Id.* The Petitioner came to visit, and Co-Defendant O'Neill accompanied him when he left and spent the night with the Petitioner at the Petitioner's home. *Id.* The next morning, the Petitioner awakened Co-Defendant O'Neill to tell him that Daquawn had been robbed. *Id.* The Petitioner then drove Co-Defendant O'Neill to the Moses Avenue residence, where a group of people, including Daquawn and Ms. Hollingsworth, were talking about the robbery. *Id.*

Co-Defendant O'Neill testified that Daquawn told them that he had had been forced to walk back naked to the Moses Avenue residence after the robbery and that he thought Tony Dixson had something to do with the robbery. *Id.* at *4. The Petitioner and Mr. Braxton Williams then went inside the Moses Avenue residence and the Petitioner emerged carrying an AK-47. *Id.* Ms. Hollingsworth, visibly frightened, left. *Id.* A short time later, Ms. Blair Williams called Ms. Hollingsworth, and the Petitioner got up and, armed with the AK-47, left alone in his Toyota Camry. *Id.* About five minutes later, the Petitioner returned, telling them that he had not seen anybody. *Id.*

Later, Ms. Blair Williams was again talking with Ms. Hollingsworth over the phone and put the conversation on speaker phone. *Id.* The Petitioner recognized voices in the background and he and Co-Defendant O'Neill reacted by immediately driving to the Brown-Maples residence, where the Petitioner opened fire with his AK-47. *Id.* Our direct appeal opinion summarizes this portion of Co-Defendant O'Neill's trial testimony as follows:

After that, [Ms. Williams] was on the phone with [Ms. Hollingsworth] again, and she put [Ms. Hollingsworth] on speaker phone. According to Mr. O'Neill, "all of the sudden ... there was [sic] voices heard over the speaker phone[,] and somebody busted out and said, they're over there, they're over there, because they're telling [Ms. Hollingsworth] to hang up the phone, hang up the phone." Mr. O'Neill testified that, in response, he and the [Petitioner] got in the Camry. Mr. O'Neill was driving. Mr. O'Neill said that Daquawn tried to talk them out of going to find Mr. Dixson, saying, "[D]on't worry about it, I've already filled out a police report." They went anyway.

The [Petitioner], who had brought the AK-47 with him, gave directions to Mr. O'Neill as he drove because Mr. O'Neill did not "know where to go" being unfamiliar with the area. After turning onto Nolan Avenue, they spotted [Ms. Hollingsworth]'s car. The [Petitioner] instructed Mr. O'Neill "to go slow[,]" and he "pulled the gun out the window." Mr. O'Neill said that he then saw "movement out of [his] peripheral, but [he] never looked directly at the house." The [Petitioner] "opened fire" just as they passed the Brown-Maples residence, according to Mr. O'Neill. Mr. O'Neill did not see anyone else shooting and did not hear any other shots being fired. The [Petitioner] then said "go, go[.]" Mr. O'Neill "hit the gas," and the [Petitioner] directed him back to 1605 Moses.

*Id.*

On cross-examination, Co-Defendant O'Neill testified that Daquawn mentioned Mr. Hollingsworth's name as another individual possibly involved in the robbery. *Id.* at *5. Co-Defendant O'Neill saw "'some movement in [the] area'" of a GMC Envoy that was parked in the yard of the residence, but he did not think anyone other than the Petitioner fired because "all he 'heard was rapid fire' from the [Petitioner's] weapon." *Id.* He acknowledged, however, that he previously told the prosecutor that he believed someone else fired a shot at some point. *Id.* On redirect examination, he said he also told the prosecutor that it was possible that what he thought he heard was an initial shot fired by the Petitioner "'before he sprayed.'" *Id.*

Mr. Maples, who had given statements to the police and to the Petitioner's trial counsel, refused to testify at trial, invoking his Fifth Amendment right against self-incrimination. *Id.* at *6. As a result, an agreed-upon stipulation as to what Mr. Maples' trial testimony would have been was read to the jury and entered as an exhibit. *Id.* Mr. Maples' recorded police interview was also admitted as an exhibit and played for the jury. According to the stipulation, Mr. Maples would have testified that Mr. Dixson took his car sometime early

4

on the morning of June 7, 2013. *Id.* When he returned the vehicle, Mr. Dixson told Mr. Maples that he and Shaquan Andrews had robbed Daquawn. *Id.* Mr. Maples did not know if Mr. Hollingsworth was involved in the robbery. *Id.* Later that day when Mr. Maples was shopping with Ms. Brown for strollers for their twins, Ms. Hollingsworth called Mr. Maples to warn him that "'the Moses men were looking to shoot them.'" *Id.*

When Mr. Maples and Ms. Brown returned home, Mr. Maples saw parked vehicles at his house that belonged to Mr. Dixson, Mr. Andrews' girlfriend, and Ms. Hollingsworth. *Id.* As he was getting one of his twins out of the car, the Petitioner slowly drove past his home, asking "What's up?" and then continuing down the street. *Id.* Mr. Maples found Mr. and Ms. Hollingsworth, Mr. Andrews, Mr. Dixson, and "Little Ty" inside his home, and "told them they had to leave." *Id.* At that time, Mr. Dixson was armed with a .45 caliber handgun and Mr. Andrews with a 9mm. *Id.*

Mr. Maples went outside again approximately five to seven minutes later after Mr. and Ms. Hollingsworth, Mr. Dixson, and "Little Ty" had already exited the residence. *Id.* Mr. Maples was on the screened-in porch with Mr. Andrews when the shooting occurred. *Id.* According to Mr. Maples, Mr. Dixson had moved into the yard before the shooting began. *Id.* Mr. Maples did not, however, see where he went. *Id.* Mr. Maples also did not see either Mr. Dixson or Mr. Andrews holding a gun when they exited the house and was unsure if anyone other than the passenger of the Camry fired a weapon. *Id.* He identified Daquawn as the shooter but was not certain of his identification. *Id.*

Other State's witnesses included a neighbor who lived behind the Brown-Maples residence, who reported hearing twenty-eight to thirty shots from the AK-47 and, in the midst of those shots, "three or four more shots" that sounded as if they came from a different gun "like an M-80 or something[.]" *Id.* at *8. The police investigation uncovered multiple bullet strikes to the Brown-Maples residence, to the next-door residence, to Mr. Maples' vehicle, to a Chevrolet Trailblazer parked in the driveway of the next-door residence, and to a maroon Buick Park Avenue parked in front of Mr. Maples' vehicle. *Id.* at * 2-3. "The damage to these vehicles and residences all came from an easterly direction." *Id.* at *3. Investigators found thirty-two spent 7.62 x 39mm shell casings in the road to the east of the residence, a bullet hole in the right side of a GMC Envoy that was parked diagonally across the Brown-Maples yard, four live 9mm rounds near the rear bumper of the Envoy, and four spent .45 shell casings "'to the right and around [a] little doghouse area[.]'" *Id.*

5

Investigator Jason Booker of the Knoxville Police Department testified that he learned during his investigation that Mr. Andrews' aunt lived next-door to the Brown-Maples residence. *Id.* at *9. "[D]uring a 9-1-1 call following the shooting, a female said that she 'saw someone carrying a gun from the scene of the shooting[,]' " and Mr. Maples later admitted that he had hidden an SKS rifle at Mr. Andrews' aunt's house before the police arrived at the scene. *Id.* Another neighbor told Investigator Booker that "'[Mr. Maples] ran with a bad group of folks,' and he said there's actually been shootings over there at the house before.'" *Id.*

The Petitioner, whose statement to police in which he denied any involvement in the shooting was played for the jury during the State's case-in-chief, *Id.* at *5, testified in his own defense at trial. *Id.* at *10-11. The Petitioner admitted that he was angry about his brother's having been robbed and that he retrieved the AK-47 and drove alone to the Brown-Maples residence to search for the robbers. *Id.* at *10. He claimed that his intention was only to get his brother's money returned. *Id.* He admitted that he and CoDefendant O'Neill returned to the residence after he heard voices in the background of Ms. Hollingsworth's phone conversation with Ms. Blair. *Id.* He said that when they reached the residence, an African American man wearing a white shirt came out of nowhere and pointed a gun at him. *Id.* The Petitioner stated that he grabbed his AK-47 from the floorboard of his vehicle and yelled to Co-Defendant O'Neill to drive away, but Co-Defendant O'Neill accidentally put the vehicle in neutral for a moment before getting it in gear. *Id.* The Petitioner said that he started shooting at the gunman in the white shirt as Co-Defendant O'Neill was driving away. He was not certain that the gunman fired at him, but he believed that he did. *Id.* On cross-examination, the Petitioner "conceded that the bullet th[at] killed Ms. Brown 'must' have come from his gun." *Id.* at *11.

*Simmons v. State*, No. E2021-00819-CCA-R3-PC, 2022 WL 3226795, at *1–3 (Tenn. Crim. App. Aug. 10, 2022), *perm. appeal denied* (Dec. 14, 2022) ("*Simmons II*"). Petitioner proceeded to trial and was convicted as charged. *Simmons I*, 2018 WL 1381786, at *1. The trial court sentenced Petitioner "to life imprisonment for the murder conviction and to concurrent three-year sentences for the two aggravated assault convictions." *Id.* at *11.

6

Petitioner appealed his convictions to the TCCA arguing, among other things, "that the evidence was insufficient to support his convictions because the State failed to prove that the [Petitioner] was the person who shot the murder victim or that the [Petitioner] acted with premeditation[.]" *Id.* at *1. The TCCA affirmed the trial court's judgments. *Id.* Petitioner subsequently applied for discretionary review [Doc. 14-26], but his application was denied [Doc. 14-28].

Thereafter, Petitioner filed a pro se petition for post-conviction relief in the trial court, which appointed post-conviction counsel. *Simmons II,* 2022 WL 3226795, at *4. Petitioner filed two pro se amended petitions after counsel was appointed. *Id.* The TCCA summarized the proof offered at Petitioner's evidentiary hearing as follows:

> At the June 23, 2001 evidentiary hearing, the Petitioner first complained about trial counsel's failure to cross-examine Mr. Maples about his refusal to testify. The Petitioner stated that Mr. Maples was prepared to testify on the Petitioner's behalf until February 26, 2014, when Mr. Maples and Mr. Dixson were transported to the same jail and housed in neighboring cells, which gave Mr. Dixson the opportunity to threaten Mr. Maples. The Petitioner testified that, had his trial counsel cross-examined Mr. Maples at the hearing in which Mr. Maples invoked his Fifth Amendment right not to incriminate himself, counsel could have elicited information from Mr. Maples about the threat.
>
> The Petitioner acknowledged that trial counsel filed a motion to withdraw in the hope that they would be allowed to testify about Mr. Dixson's threats, but the trial court denied their motion. He agreed that after the motion to withdraw was denied, trial counsel entered into a stipulation with the State as to Mr. Maples' testimony. The Petitioner expressed his belief that his right to confront witnesses was violated by the stipulated testimony and that trial counsel "should have objected and conducted a hearing[.]" The Petitioner testified that relevant and essential evidence left out of the stipulation was that Mr. Maples identified someone other than the Petitioner as the individual who shot Ms. Brown. In addition, the stipulation hurt his case because it included information that the Petitioner was "there shooting and being in other criminal activities and things of that nature."

7

The Petitioner also complained about trial counsel's failure to combat the ballistics evidence introduced by the State. Specifically, he believed that trial counsel should have presented a ballistics expert and introduced photographs that would have shown that the bullet that killed Ms. Brown did not come from an AK-47. The Petitioner identified two photographs of bullets that, according to the Petitioner, showed the difference between the bullets fired by an AK-47 and the bullet that killed Ms. Brown. He said the bullets depicted in the photographs appeared consistent with bullets fired by an AK-47 because they had a coating, or jacket, on them, whereas, according to the Petitioner's interpretation of the medical examiner's testimony, the bullet recovered from Ms. Brown's body did not. The Petitioner testified that he discussed with his trial counsel the potential exculpatory nature of the photographs but counsel never introduced them or talked about the issue at trial.

On cross-examination, the Petitioner acknowledged that he told the trial court that he was okay with the stipulation. However, "[t]he stipulation [he] agreed to was not the stipulation that was actually presented at trial." He said he attempted to tell trial counsel that the stipulation was different from what he agreed, but they told him to wait until the end of trial and that they would raise it in the motion for new trial. The Petitioner conceded that he was not a firearms or ballistics expert but said he had some familiarity with AK-47 bullets, had conducted online research, and had discovered "that a 7.62 by 39mm is a full metal jacket, FMJ, full metal jacket. It has a coating on it and it has a jacket on it." The Petitioner expressed his certainty that the bullet that killed Ms. Brown was not from an AK-47 based on his online research about AK-47 bullets having a full metal jacket and the medical examiner's testimony that the bullet fragments recovered from the victim's body did not have any particular coating that was discernible under a microscope.

The Petitioner acknowledged that his senior trial counsel was a very experienced attorney and that he had filed and argued numerous motions on his behalf, met with him a number of times, hired an investigator, and assembled an entire team to work on his case. He believed, nevertheless, that trial counsel made a mistake in not presenting what the Petitioner was convinced was exculpatory ballistics evidence.

On redirect examination, the Petitioner explained his belief that photographs of the bullet holes in Mr. Maples' vehicle were exculpatory because they showed that the trajectory of the bullet that killed Ms. Brown was from somewhere other than the street:

8

It says in the autopsy report that she was hit from left to right, upwards. Like, it travelled going up. So, basically, she would have had to have been shot with somebody moving, going like -- trying to duck and dodge and shoot up.

Senior trial counsel testified that he had been practicing law for over forty-one years, having been the Public Defender for the South Judicial District in Knoxville for approximately twenty-nine and one-half years, a private criminal defense lawyer for eight years, and a prosecutor for approximately two and one-half years. During that time, he had tried approximately eighty cases, most of which were murder cases, and had handled hundreds of other cases.

Senior trial counsel testified that his office was appointed to represent the Petitioner. He said in a case of the Petitioner's magnitude, an entire defense team was assigned that would consist of two to four lawyers, a full-time investigator, a social worker, and a secretary. If the case continued long enough, law clerks and summer externs would be assigned as well. In the Petitioner's case, the attorney who handled the appellate work in their office became involved early on as a sort of "de facto" member of the defense team, assisting senior trial counsel and co-counsel with pretrial motions and strategy decisions.

Senior trial counsel testified that their goal was to meet with the Petitioner at least once a week, and he estimated that either he or co-counsel, or both of them together, met with the Petitioner over a hundred times. Among other things, they kept the Petitioner informed about what was happening in his case, retained the services of an expert to explore the Petitioner's mental status and possible diminished mental capacity, investigated the background of the State's witnesses, and retained their own ballistics expert to review the crime scene evidence. Senior trial counsel testified that their ballistics expert ultimately reached the same conclusion as the State's expert -- that the fatal shot came from the AK-47 fired from the street. Senior trial counsel said that he and his co-counsel attempted as best they could to develop the proof at trial that there were other armed individuals at the scene. However, it would have been very difficult for them to argue that the fatal shot came from somewhere other than the AK-47 given their expert's conclusions and senior trial counsel's own examination of the vehicle at the impound lot, which convinced counsel "that the trajectory and the path came from back -- from the back and struck [Ms. Brown]." Senior trial counsel stated that the Petitioner was aware that they had retained a ballistics expert and was informed of the expert's conclusions.

9

Senior trial counsel testified that everyone at the residence at the time of the shooting had pending criminal charges and was represented by counsel, which made the process of interviewing witnesses more difficult. He said Mr. Andrews' attorney denied permission for counsel to talk to Mr. Andrews but they ultimately received permission from the other individuals' respective counsel. He and co-counsel were unable to locate Mr. Hollingsworth, despite repeated attempts, but they spoke in the penitentiary with Mr. Maples, who was cooperative and gave them a very favorable statement, and with Mr. Dixson, who was hostile and threatening and "made it very clear that Mr. Maples was in very grave danger if he . . . talked to [counsel] or cooperated or testified[.]" Senior trial counsel recalled that Mr. Dixson went so far as to threaten co-counsel if co-counsel did not relay Mr. Dixson's threat to Mr. Maples.

Senior trial counsel testified that when they interviewed Mr. Maples at the penitentiary, Mr. Maples told them that Mr. Dixson, Mr. Hollingsworth, and Mr. Andrews all exited the house before Mr. Maples, that all three of the men were armed with, variously, a .45, an SKS, and a 9mm, that Mr. Dixson was in the same position where spent .45 shell casings were found, and that Mr. Maples believed Mr. Dixson was the one who killed Ms. Brown. Mr. Maples additionally told them that the above three men were the ones who fired first.

Senior trial counsel testified that Mr. Maples, although initially willing to testify for the Petitioner, expressed grave concerns about his personal safety, informing counsel that Mr. Dixson had numerous fellow gang members in prison who would be able to get to Mr. Maples. Senior trial counsel said he assured Mr. Maples that counsel would go out of their way to protect him and would seek an order from the trial court that Mr. Dixson and Mr. Maples be transported separately and housed in different areas of the detention center. Although trial counsel obtained the order, when it came time for trial, Mr. Maples and Mr. Dixson were not only transported together on the same van, but also forced to sit beside each other for a considerable length of time due to weather delays. To make matters worse, they were then placed in side-by-side cells at the detention center. After that, Mr. Maples adamantly refused to testify.

Senior trial counsel testified that Mr. Maples refused to even go to the courtroom and that, short of dragging him, there was nothing they could do. Therefore, in a "Hail Mary" move, he and co-counsel filed a motion to withdraw in the hopes that they would be allowed to testify about Mr. Dixson's threats and Mr. Maples' statements to trial counsel. When the trial court denied the motion, they came up with the agreed stipulation that

consisted of a combination of Mr. Maples' statements to trial counsel and to the police.

On cross-examination, senior trial counsel testified that they did not learn of Mr. Maples' refusal to testify until they visited him in the detention center on the weekend before the Monday start of trial. He recalled that he and co-counsel visited Mr. Maples a second time in an attempt to get him to change his mind about testifying, to no avail. Therefore, after consulting with the appellate expert in their office, they came up with the idea of withdrawing from representation in order to become witnesses at the trial. Senior trial counsel testified that their office's appellate expert served as counsel on their motion to withdraw. He said the trial court denied the motion on the basis that the testimony they sought to present constituted inadmissible hearsay.

Senior trial counsel testified that he did not prepare the motion for new trial and that his guess was that it was prepared by their office's appellate expert. He said a different lawyer eventually took over the Petitioner's appeal, and he assumed that appellate counsel and his office's appellate expert consulted with each other about which issues to include in the motion for new trial or in an amended motion for new trial. Senior trial counsel believed that the trial court's denial of the motion to withdraw was included in the motion for new trial but said that he was not certain and that the motion would speak for itself.

*Simmons II*, 2022 WL 3226795, at *4–6. Following the hearing, the post-conviction court denied relief. *Id.* at *7.

Petitioner appealed the denial of post-conviction relief to the TCCA. *Id.* at *1. He specifically argued, in relevant part, that trial counsel was ineffective for "not raising the trial court's denial of trial counsel's motion to withdraw as an issue in the motion for a new trial, and . . . for not introducing 'exculpatory photographs relating to bullet holes and bullets from the scene of the shooting.'" *Id.* at *8. The TCCA affirmed the trial court's judgment. *Id.* at *9. The Tennessee Supreme Court denied Petitioner's application for discretionary review [Doc. 14-35; Doc. 14-45].

Thereafter, Petitioner filed a timely federal habeas petition [Doc. 1]. Respondent subsequently filed the state-court record[3] [Doc. 14] and his response to the petition [Doc. 16], to which Petitioner replied [Doc. 19]. This matter is now ripe for review.

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529

---

[3] The Court granted Respondent's motion to waive filing of the physical exhibits introduced at Petitioner's trial [Docs. 15, 17; *see also* Docs. 23, 24].

U.S. at 407–08; *Brown v. Payton*, 544 U.S. 133, 141 (2005).  But even an incorrect state court decision is not necessarily unreasonable.  *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Williams*, 529 U.S. at 410–11.  Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Federal habeas review is also limited by the doctrine of procedural default.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim).  A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal.  *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729, 731–32, 735 n.1 (1991).

Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 302–03 (1984)).  In Tennessee,

13

presentation of the claim to the TCCA satisfies this requirement. Tenn. S. Ct. R. 39. But if a prisoner never presented a claim to the TCCA and a state procedural rule now bars presentation of the claim, because, for example, it is barred by Tennessee's one-year statute of limitation on post-conviction actions or its prohibition against second petitions, that claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *Coleman*, 501 U.S. at 731–32, 750; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

In some circumstances, a procedural default may be circumvented to allow federal habeas review of a claim. But that is appropriate only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules. *See Coleman*, 501 U.S. at 753. And the "prejudice" sufficient to overcome a default must be actual, with the petitioner bearing "the burden of showing, not merely that the errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

14

Generally, errors of post-conviction counsel cannot serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 752. An exception to this rule was established in *Martinez v. Ryan*, which held that the inadequate assistance of post-conviction counsel or the absence of such counsel may, under certain circumstances, establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). The Supreme Court has described the *Martinez* exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. at 13–14, 16–17). This exception applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

Therefore, when considering an ineffective assistance of trial counsel claim under *Martinez*, a petitioner must show the ineffectiveness of post-conviction counsel and "the 'substantial' nature of his underlying [ineffective assistance of trial counsel] claims." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). A substantial claim is one that "has some merit." *Martinez*, 566 U.S. at 14. Conversely, a claim is insubstantial if it "does not have any merit or. . . is wholly without factual support." *Id.* at 15–16. And if the petitioner can successfully demonstrate cause and prejudice of post-conviction counsel

15

under this preliminary review, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *Atkins v. Holloway*, 792 F.3d 654, 659–60 (6th Cir. 2015).

However, the *Martinez* exception does not apply to a claim of ineffective assistance of trial counsel that a petitioner raised in the initial-review collateral stages and defaulted on appeal. *See, e.g., Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals"). And *Martinez* does not excuse a petitioner's failure to develop a factual record for a claim, even where he attributes that failure to the ineffective assistance of his post-conviction counsel. *Shinn v. Ramirez*, 596 U.S. 366, 383 (2022).

With these standards in mind, the Court turns to a consideration of Petitioner's claims.

## III. ANALYSIS

### A. Ground One

Petitioner raises the following claims in Ground One, as liberally construed and paraphrased by Respondent:

> (1) the prosecution violated Petitioner's Fourth Amendment right by not producing "key witnesses" at trial seemingly due to an evidentiary issue related to the recovered bullets; (2) the first-degree-murder indictment was defective because it did not allege that Petitioner shot Brown with an AK-47; (3) ineffective assistance of post-conviction counsel for not retaining a

16

ballistics expert for the evidentiary hearing; and (4) the prosecution produced insufficient evidence for the jury to find Petitioner guilty of first-degree murder beyond a reasonable doubt.

[Doc. 16, p. 11].

### 1. Fourth Amendment

Petitioner maintains that the prosecutor violated his Fourth Amendment rights by failing to produce crime scene witnesses to testify at trial [Doc. 1, p. 5]. While Petitioner does not identify these witnesses, his claim appears to question expert testimony that Petitioner shot the bullet that killed the victim [*Id.* at 5–6].

But Petitioner did not exhaust this Fourth Amendment claim to the TCCA during his direct or post-conviction appeals [*See* Doc. 14-23, pp. 7–8; Doc. 14-32, p. 6]. *See Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003) (finding presentation of claim to TCCA sufficient to exhaust state remedies); *see also* Tenn. S. Ct. R. 39 (establishing presentation of claim to TCCA is sufficient to exhaust state remedies). Because Petitioner no longer "has the right under the law" of Tennessee to properly exhaust this claim, the claim is technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins*, 792 F.3d at 657 ("[W]hen a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

Therefore, the Court may review the merits of Petitioner's claim only if he establishes cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would result if the Court did not consider it. Petitioner does not establish any of

17

these exceptions. The Fourth Amendment's "basic purpose" "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967)). But Petitioner's claim does not allege a governmental intrusion into his "privacy and security." And testimony was offered at Petitioner's trial that all the bullets that struck the victim's car came from the street, where Petitioner was the only shooter [*See, e.g.*, Doc. 14-16, pp. 84–135; Doc. 14-18, pp. 155, 173]. Therefore, given the overwhelming evidence presented against him at trial, Petitioner cannot establish prejudice or that his case meets the fundamental-miscarriage-of-justice exception. *See Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994) ("[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of a petitioner's guilt and lack of evidence to support his claim." (citing *Frady*, 456 U.S. at 172)). Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### 2. Indictment

Petitioner argues that his indictment for first-degree premeditated murder did not provide constitutionally adequate notice of the charge because it did not allege that he committed the murder with an AK-47 [Doc. 1, pp. 5–6]. But Petitioner did not present this claim to the TCCA during either his direct or post-conviction appeal [*See* Doc. 14-23, pp. 7–8; Doc. 14-32, p. 6]. And Petitioner cannot now litigate this claim in state court due to Tennessee's statute of limitations and "one petition" rule. *See* Tenn. Code Ann.

§§ 40-30-102(a),(c). Therefore, this claim is technically exhausted but procedurally defaulted. *See Jones*, 696 F.3d at 483.

Accordingly, the Court may review the merits of Petitioner's claim only if he establishes cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would result if the Court did not consider it. But, as set forth above, Petitioner cannot claim a fundamental miscarriage of justice to defeat the procedural default. Additionally, for the reasons set forth below, Petitioner cannot establish prejudice, because the indictment against him provided him constitutionally sufficient notice of the charged offense of premeditated first-degree murder. *See Frady*, 456 U.S. at 170.

Clearly established law holds that a defendant must have constitutionally sufficient notice of the crimes with which he is charged. *Hamling v. United States*, 418 U.S. 87, 117 (1974). An indictment provides constitutionally sufficient notice if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge which he must defend" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id*. At the time of Petitioner's crime, Tennessee defined "first-degree premeditated murder" as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a). Petitioner's indictment charges him with "unlawfully, intentionally, and with premeditation kill[ing] Uniqua Brown, in violation of T.C.A. § 39-13-202" [Doc. 14-1, p. 8]. Using the statutory language to define a crime is sufficient for notice purposes if "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Russell v. United States*, 369 U.S. 749, 765 (1962)

19

(citation omitted). Here, Petitioner's indictment echoes the language of the statute, and it clearly described the charged offense. Despite his protestations that the indictment did not identify the weapon he used to kill the victim, Petitioner has no clearly established constitutional right for his state indictment to include that level of particularity. *Williams v. Haviland*, 467 F.3d 527, 534 (6th Cir. 2006) (holding "there is no constitutional right in a state prosecution to a grand jury indictment with particular specificity"). Accordingly, Petitioner's indictment provided constitutionally sufficient notice, and he is not entitled to federal habeas relief on this defaulted and meritless claim.

### 3.    Ineffective Assistance of Post-Conviction Counsel

Petitioner maintains that post-conviction counsel rendered ineffective assistance when he failed to retain a ballistics expert for the evidentiary hearing [Doc. 1, p. 6]. But "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). Therefore, this claim is not cognizable on federal habeas review.

### 4.    Sufficiency of the Evidence

Petitioner claims that the prosecution introduced insufficient evidence for the jury to convict him of first-degree murder [Doc. 1, p. 6]. Petitioner exhausted this claim on direct appeal to the TCCA. *See Simmons I*, 2018 WL 1381786, at *29–31.

Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.

20

307, 319 (1979) (emphasis in original). This standard acknowledges the factfinder's role to resolve all conflicts in testimony, weigh the evidence, and "draw reasonable inferences from basic facts to ultimate facts." *Id*. And a habeas court reviewing a properly exhausted *Jackson* claim affords it a doubly deferential standard of review. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, a court reviewing the verdict can set it aside "only if no rational trier of fact could have agreed with the jury." *Id*. (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). Second, a federal habeas court must account for the statutory deference under § 2254(d) allotted to the state-court's review of the jury's findings. *Id*. Thus, a habeas court reviewing the state court may overturn the state court's decision "only if the state court decision was objectively unreasonable." *Id*. (internal quotation marks omitted).

In evaluating the sufficiency of the evidence against Petitioner, this Court must examine the "substantive elements of the criminal offense" under state law. *Jackson*, 443 U.S. at 324 n.16. At the time of the victim's murder, Tennessee defined "first-degree premeditated murder" as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A murder is "premeditated" when it is "done after the exercise of reflection and judgment" with the intent to murder being "formed prior to the act itself." Tenn. Code Ann. § 39-13-202(e). The factual circumstances surrounding the killing inform the jury's decision as to whether a defendant killed with premeditation. *Simmons I*, 2018 WL 1381786, at *30.

On direct appeal, the TCCA cited and applied *Jackson* in its analysis of Petitioner's case. *See id*. at *29–31. And Petitioner does not establish how the TCCA unreasonably applied *Jackson*. Nevertheless, the Court agrees with Respondent that the TCCA's

21

application was sound considering "forensic evidence established that. . . Defendant was the only shooter[,]" that he acknowledged during trial that "the bullet that killed [the victim] must have come from his weapon[,]" that the jury was "free to reject [his] self-defense claim[,]" and that Petitioner's co-defendant, O'Neill, stated that he knew that Petitioner was going "to shoot" when they went to the Brown-Maples home. *Simmons I*, 2018 WL 1381786, at *30–31. Additionally, testimony was presented that Petitioner "waited until he believed the men who had robbed his brother the evening before were present" before shooting 32 rounds at the victims, killing one. *Id*. at 31. The jury was presented with evidence that Petitioner and O'Neill then fled, and Petitioner ordered O'Neill "to hide the car" while Petitioner "disposed of the AK-47 [] and took off his shirt and attempted to clean himself of gunshot residue." *Id*. at 31. And because the evidence presented at trial was sufficient for a rational factfinder to convict Petitioner of first-degree, premeditated murder beyond a reasonable doubt, the TCCA's adjudication was not based on an unreasonable application of *Jackson*, or an unreasonable determination of facts in light of the evidence presented in the state court proceeding. Petitioner is not entitled to federal habeas relief on this claim.

## B. Ground Two

Petitioner alleges that his trial, appellate, and post-conviction attorneys were ineffective by holding "the true belief that challenging the indictment was not relevant and that relief could not be granted as a matter of law" [Doc. 1, p. 7]. He argues that the indictment was "fatally defective" because "the jury was led to presume and speculate that the victim['s] death occurred from any bullet" [*Id*.].

22

First, Petitioner cannot obtain relief based on post-conviction counsel's alleged ineffectiveness because the AEDPA bars this claim. 28 U.S.C. § 2254(i). Second, Petitioner did not present the TCCA with a claim of trial or appellate attorney ineffectiveness based on the failure to challenge the indictment [*See generally* Doc. 14-32, p. 6]. *See Simmons II*, 2022 WL 32226795, at *8–9. State law would now bar any attempt to litigate these allegations. *See* Tenn. Code Ann. §§ 40-30-102(a), (c). Therefore, these allegations are technically exhausted but procedurally defaulted. *See Jones*, 696 F.3d at 483.

Petitioner cannot avail himself to the miscarriage-of-justice exception to excuse his default, as the evidence introduced against him at trial was overwhelming. And Petitioner cannot rely upon the equitable exception under *Martinez* to excuse appellate counsel's conduct, as *Martinez* does not extend to defaulted claims of ineffective assistance of appellate counsel. *See Davila v. Davis*, 582 U.S. 521, 529 (2017).

Neither can *Martinez* provide an exception to trial counsel's conduct, as Petitioner cannot show that his claim of ineffectiveness is substantial. A determination of whether an ineffective assistance of counsel claim is substantial requires a federal court to examine the claim under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy a conjunctive, two-pronged test to establish the constitutionally ineffective assistance of counsel: (1) he must demonstrate constitutionally deficient performance by counsel, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. *Id.* at 687. Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of

23

reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687–88. But a reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id*. at 687, 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id*. at 691.

Petitioner renews his argument from Ground One that the indictment was defective because it did not name the "kind of bullet nor gun" that "caused the victim['s] demise" [Doc. 1, p. 7]. But, as discussed *supra*, the indictment did not need to describe the means of the murder to pass constitutional muster. Using statutory words defining a crime is sufficient for notice purposes if "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Russell*, 369 U.S. at 765. Because the indictment in Petitioner's case met this standard, trial counsel did not perform ineffectively in failing to challenge it. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 321–22 (6th Cir. 2011) (finding an "attorney is not required to raise a non-meritorious claim"). And Petitioner cannot establish any resulting prejudice from the failure to challenge the indictment, as he has not

24

established a reasonable probability that the trial court would have dismissed the indictment if trial counsel had so moved. *See Strickland*, 466 U.S. at 694. Accordingly, this defaulted claim of ineffective assistance of trial counsel is not substantial.

In sum, Petitioner is not entitled to federal habeas relief on Ground Two.

## C. Ground Three

In Ground Three, Petitioner alleges that he "talked about the 911 callers to the operator that the post-conviction did not address issues at hand[.] [T]he 911 caller stated that there was other people with guns in the year [sic] shooting and the other 911 callers stated after the shooting black guys took a bunch of guns to the house next door" [Doc. 1, p. 8]. He also maintains that there "are exhibits as (exhibit 1) (exhibit 8) of the calls to the operator on the CD that Petitioner don't have d[ue] to the court won[']t send it to me" [*Id.*].

"A petition for a writ of habeas corpus must set forth facts that give rise to a cause of action under federal law or it may summarily be dismissed." *Edwards v. Johns*, 450 F. Supp. 2d 755, 756 (E.D. Mich. 2006) (citation omitted). A claim "must include reference to a specific federal constitutional guarantee, as well as a statement of facts which entitle the Petitioner to relief." *Id.* (quoting *Gray v. Netherland*, 518 U.S. at 162–63) (internal citations omitted); *see also* Rule 2(c)(1)-(3), § 2254 Rules. Petitioner has alleged neither a "reference to a specific constitutional guarantee" nor "a statement of the facts which entitle [him] to relief." *Edwards*, 450 F. Supp. at 756. Therefore, this ground pleads no constitutional claim.

However, under the most liberal construction, the Court may infer that Petitioner is alleging that he did not receive adequate due process during his post-conviction hearing.

25

But the Sixth Circuit "has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007). This is because "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Id*. (internal quotation marks and citation omitted). But "[a] due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Id*. (internal quotation marks and citation omitted). Therefore, even if Petitioner did intend to plead a due process claim related to his post-conviction proceedings, it is not cognizable. Accordingly, Petitioner is not entitled to federal habeas relief on Ground Three.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason

26

would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added).  Applying this standard, the Court concludes that a COA should be denied in this case.

## V.     CONCLUSION

For the reasons set forth above, Petitioner has failed to demonstrate an entitlement to federal habeas relief.  Therefore, the instant petition [Doc. 1] will be **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.  A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous.  Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE